## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| ELITE ADVANTAGE, LLC, a Florida Limited Liability Company; and EDWARD E. SELL, an individual, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED | ) ) ) ) ) | Case No. _____ |
| Plaintiffs, | ) ) | |
| v. | ) | |
| TRIVEST FUND IV, L.P., a Delaware limited partnership; TRIVEST PARTNERS GP, LLC, a Delaware limited liability company; TRIVEST PARTNERS IV, INC., a Delaware corporation; and TROY D. TEMPLETON, an individual; | ) ) ) ) ) ) ) | COMPLAINT JURY TRIAL DEMANDED |
| Defendants. | ) | |

## INTRODUCTION

1.      Plaintiffs Elite Advantage, LLC and Edward E. Sell bring this putative class action on behalf of themselves and on behalf of similarly situated DirectBuy franchisees ("Franchisees") asserting that Defendants Trivest Fund IV, L.P., Trivest Partners GP, LLC, Trivest Partners IV, Inc. (collectively "Trivest"), and Troy D. Templeton ("Templeton") perpetrated a fraudulent scheme, in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO"), and engaged in unfair, unconscionable, and deceptive acts and practices, in violation of the Florida Deceptive and

Unfair Trade Practices Act ("FDUTPA"), Fl. Stat. §§ 501.201, *et seq.*, to enrich themselves through the fraudulent and unauthorized taking of the funds of Plaintiffs and the Franchisees.

2.     Plaintiffs and the Franchisees are current and former franchisees of DirectBuy, Inc. ("DirectBuy").  DirectBuy franchises the right to own and operate members-only buying clubs ("Clubs") under its trade name and trademarks in the United States and Canada. Consumers pay a membership fee for the right to join the Clubs, where the members are able to purchase products at wholesale-type prices.

3.     The written Franchise Agreements between DirectBuy, on the one hand, and Plaintiffs and Franchisees, on the other hand, require Plaintiffs and Franchisees to pay a royalty to DirectBuy equal to 22% of the gross amount Plaintiffs and Franchisees charge for new memberships sold to consumers.  Accordingly, DirectBuy has a strong financial incentive to generate new membership purchases at the Clubs.

4.     Because DirectBuy receives royalties based on the *gross* amounts charged for new memberships, regardless of whether Plaintiffs and Franchisees make a *net* profit, and Plaintiffs and Franchisees only put money in their pockets if they generate a *net* profit, there is an inherent conflict of economic interests between DirectBuy and Plaintiffs and Franchisees in the way in which each generates its cash flows.

5.     DirectBuy uses marketing and advertising as a mechanism to drive up the number of new memberships sold, the cost of which is borne almost exclusively by its franchisees (with the exception of a limited amount DirectBuy billed to its corporate stores and the amounts for which DirectBuy bills franchisees but does not collect).  Therefore, the

advertising expense is overwhelmingly placed on DirectBuy's franchisees, including Plaintiffs and Franchisees, while DirectBuy reaps the rewards in the form of increased royalties.

6.     Because of the disparity in how DirectBuy, versus Plaintiffs and Franchisees, generate cash flow and the fact that DirectBuy franchisees almost exclusively bear the financial burden of the local marketing and advertising done to increase membership sales, the Franchise Agreements limited the contributions Plaintiffs and Franchisees are required to make to DirectBuy for national marketing and advertising programs to no more than "3% of the gross amounts [the franchisee charges] for new memberships" (referred to herein as the "3% Cap").

7.     In November 2007, the Trivest Defendants purchased DirectBuy for $550 million through a highly leveraged transaction. This transaction involved DirectBuy Holdings, Inc. ("DB Holdings"), a holding company created for the purpose of the transaction that became the ultimate parent of DirectBuy, issuing high yield bonds to pay for the vast majority of the purchase price.   DirectBuy was a guarantor of these bonds, which were also secured by the assets of DirectBuy.   Additionally, Defendants put into place a system whereby DirectBuy funded the payments for the bonds through an undocumented, unsecured, non-interest bearing "loan" from DirectBuy to DB Holdings.   This resulted in a situation where, in order to not default on the bonds, DirectBuy needed to drive substantial new membership sales to fund the bond obligations of DB Holdings that had been used by the Trivest Defendants to purchase DirectBuy.

8.    Because of the need to drive substantial new membership sales, and the fact that the costs for marketing and advertising were primarily borne by DirectBuy franchisees, Defendants, through their control of DirectBuy, engaged in a scheme to fraudulently induce Plaintiffs and Franchisees into funding DirectBuy marketing and advertising programs, by imposing unauthorized charges in excess of the 3% Cap.

9.    Defendants exercised control of DirectBuy through the installment of Templeton as the Chairman of DirectBuy's Board of Directors, soon after Trivest's acquisition of DirectBuy, and by imposing an ongoing requirement that any significant decision regarding the operations of DirectBuy would have to be approved by Trivest and Templeton.

10.    After Trivest's purchase of DirectBuy, charges to the DirectBuy franchisees for the marketing and advertising program ballooned to amounts far in excess of the 3% Cap.  For example, in 2009, Franchisees were charged, on average, over 6.5 times the amount that would have been allowed if the 3% Cap had been honored.

11.    Worst of all, Plaintiffs and Franchisees were powerless to stop DirectBuy's collection of these excessive marketing and advertising fees because, in many instances, DirectBuy would simply fraudulently claim these excessive and unauthorized amounts were due and payable and unilaterally bill these overcharges to Plaintiffs and Franchisees' credit cards, and when they no longer had any credit left, DirectBuy would claim and collect as receivables due and owing from Plaintiffs and Franchisees these excessive fees in one or more of three ways: (1) by placing franchisees on the "Direct Pay Program" under which DirectBuy franchisees were forced to have their customers remit funds related

to merchandise sales, including handling fees owed to Franchisees, directly to DirectBuy rather than to the franchisee; (2) by retaining amounts due to franchisees under the Beta Financing Program, a program under which customers were able to finance their membership fees; or (3) by retaining handling fees and renewal fees due to franchisees.

12.     Defendants violated section 1962(c) of RICO by participating in and conducting an enterprise through a pattern of racketeering that involved the predicate acts of mail and wire fraud, which involved the provision of fraudulent media bills to Plaintiffs and Franchisees that misrepresented the amount Plaintiffs and Franchisees were legally obligated to pay in marketing and advertising fees via the U.S. mail and over interstate wires, and financial institution fraud, which involved the fraudulent charging of Plaintiffs and Franchisees' credit cards for amounts in excess of the 3% Cap, which were not approved by Plaintiffs and Franchisees.  Additionally, Defendants violated section 1962(d) by conspiring with DirectBuy to violate section 1962(c) through the agreement of Defendants and DirectBuy to engage in the enterprise through a pattern of racketeering activity.

13.     Defendants violated the Florida Deceptive and Unfair Trade Practices Act by engaging in deceptive and unfair practices in the course of trade or commerce by implementing a scheme whereby DirectBuy assessed and collected excessive and unauthorized national advertising fees from Plaintiffs and Franchisees outside the scope of its legal entitlement in order to benefit Defendants, causing Plaintiffs and Franchisees to lose millions of dollars.

**14.**   To redress the severe economic damage done by Defendants' repeated RICO and FDUTPA violations, Plaintiffs now bring this action on behalf of themselves and other similarly situated DirectBuy franchisees.

**PARTIES**

15.   Plaintiff Elite Advantage, LLC, is a limited liability company with its principal place of business at 4019 Roberts Point Road, Sarasota, Florida.  Elite Advantage, LLC is the assignee of a Franchise Agreement entered into between Rich L and Katherine J. Miller, husband and wife, with DirectBuy, Inc., on November 29, 2005, to operate a franchise in Sarasota, Florida.  Elite Advantage, LLC's Sarasota franchise did not open for business until December 2007.  Due to its significant and ongoing operating losses, the franchise operated by Elite Advantage, LLC closed its doors on or around July 22, 2014, and is no longer in business.  By letter dated July 30, 2014, DirectBuy terminated Elite Advantage's Franchise Agreement.   Rich L. Miller and Katherine J. Miller are the principals of Elite Advantage, LLC and are Guarantors under the Franchise Agreement.

16.   Plaintiff Edward E. Sell is an individual and a resident of Indiana.  On December 23, 1997, Plaintiff Sell entered into a Franchise Agreement, as franchisee, with United Consumers Club Franchising Corporation, as franchisor, to operate a franchise in and around the Tinley Park, Illinois.   United Consumers Club Franchising Corporation changed its name to UCC TotalHome, Inc., in January 1999, and changed its name to DirectBuy, Inc. in October 2004.  The franchise operated by Mr. Sell and his wife, I.J. Sell, closed its doors on June 30, 2014, at the expiration of its term, and is no longer in business.

17.    Upon information and belief, Defendant Trivest Fund IV, L.P. is a limited partnership formed under the laws of the State of Delaware, whose principal place of business is at 550 South Dixie Highway, Coral Gables, Florida.

18.    Upon information and belief, Defendant Trivest Partners GP, LLC is a limited liability company formed under the laws of the State of Delaware, whose principal place of business is at 550 South Dixie Highway, Coral Gables, Florida.

19.    Upon information and belief, Defendant Trivest Partners IV, Inc. is a corporation formed under the laws of the State of Delaware, whose principal place of business is at 550 South Dixie Highway, Coral Gables, Florida.

20.    Upon information and belief, Defendant Troy D. Templeton is a resident of Florida and an Executive Officer and Director of Trivest Partners IV, Inc., the managing member of Trivest Partners GP, LLC, which is the general partner of Trivest Fund IV, L.P. Additionally, Mr. Templeton, upon information and belief, is the Managing Partner and a Member of the Investing Committee of Trivest Fund IV, LP. Also, Mr. Templeton was the Chairman of the Board of Directors for DirectBuy, Inc. and DirectBuy Holdings, Inc., while these entities were owned by Trivest.

## JURISDICTION AND VENUE

21.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this Court has original jurisdiction over the claims arising under RICO.

22.    Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action where at least one member of the

putative class is a citizen of a state different than the Defendants and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

23.    This Court has personal jurisdiction over the Trivest Defendants because their principal places of business are located within this district and they transact substantial business in this district.

24.    This Court has personal jurisdiction over Defendant Templeton because he is a resident of Florida and transacts substantial business in this district.

25.    This Court also has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1965(b), the nationwide personal jurisdiction provision of RICO.

26.    Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(1), because a Defendant resides in this district, and also pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to the claims alleged occurred in this district.  Additionally, venue is proper in this district pursuant to 28 U.S.C. §§ 1965(a) and (b), the nationwide venue provisions of RICO.

**FACTS**

***The DirectBuy Franchise System***

27.    In the DirectBuy Franchise System, DirectBuy franchises the right to own and operate members-only buying clubs under its trade name and trademarks in the United States and Canada to franchisees such as Plaintiffs.  In turn, franchisees operate DirectBuy centers that consumers pay a membership fee for the right to join.   After joining, the members are then able to purchase residential remodeling products (*i.e.*, cabinets, flooring, etc.) at wholesale-type prices.

28. The relationship between DirectBuy and Franchisees, including Plaintiffs, is governed by a written Franchise Agreement that details the rights and obligations of the parties, including the fees and payments that the Franchisees are required to make to DirectBuy. The Franchise Agreements are standard forms, with multiple Franchisees that join the system in the same time period having nearly identical agreements. The standard form agreements do, however, change over time, resulting in Franchisees that join the system at different times having slightly different versions of the form Franchise Agreement.

29. One of the obligations of DirectBuy franchisees, that remained the same throughout the time relevant to this dispute, is the obligation to pay to DirectBuy a royalty of 22% of the ***gross*** amount the Franchisee charges for new memberships sold to consumers. Plaintiffs and Franchisees were required to pay this amount to DirectBuy regardless of whether Plaintiffs and Franchisees made any ***net*** profit on the membership sale. Accordingly, there is a fundamental difference between the incentives of DirectBuy (and the owners of DirectBuy) versus Plaintiffs and Franchisees because ***any*** increase in membership sales benefits DirectBuy (and its owners), whereas only an increase in membership sales that allows Plaintiffs and Franchisees to receive a ***net*** profit benefits Plaintiffs and Franchisee.

30. This can lead to a situation, such as the one here, where DirectBuy has taken actions, at the direction of Trivest and Templeton, to increase the sale of memberships that could provide no benefit, and often result in financial harm, to Plaintiffs and Franchisees.

31. To provide some measure of protection against this, both the Franchise Agreements

and the federally mandated Disclosure Documents[1] limit the amounts and types of charges that can be assessed to Franchisees.

***Franchise Agreements and FDDs***

32.     The Franchise Agreements explicitly address the entire scope of the Franchisees' obligation to fund the creation and placement of national marketing, advertising, and related programs.   Under paragraph 3.03, Plaintiffs and Franchisees were required to contribute to a "Marketing and Legislative Fund" to fund the creation, development, and placement of marketing, advertising, and related programs.  All aspects of these programs were controlled by DirectBuy.

33.     It is clear from the Franchise Agreements that the Marketing and Legislative Fund was to be used for the purpose of ***placing*** advertising.   Section 7.01 of the Franchise Agreements states: "Although any marketing and advertising programs funded by the Marketing and Legislative fund are intended to maximize general recognition and patronage of the Marks for the benefit of all [DirectBuy] centers, we cannot assure you that any particular [DirectBuy] center will benefit directly or pro-rata from the ***placement*** of advertising."  (Emphasis added.)

34.     The obligation of Plaintiffs and Franchisees to fund the creation, development, and placement of marketing, advertising, and related programs was expressly capped at 3% of new membership sales by the Franchise Agreements.   Indeed, the Franchise Agreements from the relevant time period contained substantially similar language with regard to the

---

[1] Depending on when the franchise was purchased, the disclosure document is called either a Uniform Franchise Offering Circular ("UFOC") or a Franchise Disclosure Document ("FDD").  Hereinafter, the disclosure document will be referred to as an FDD.

Marketing and Legislative Fund in paragraph 3.03.  That language states:

> 3.03    **Marketing and Legislative Fund Contributions.**  You agree to contribute (at such times as we may designate from time to time) to the Marketing and Legislative Fund $1,000 during each of our fiscal years, except that you are not required to make any contributions during the first 12 months in which you operate your Center.  We have the right from time to time to increase the amount you are required to contribute to the Marketing and Legislative Fund, **provided we may not increase the amount of your contributions to more than 3% of the gross amount you have charged for new memberships (including renewal option fees, but excluding renewal fees) sold during the applicable year.**  DirectBuy center businesses owned by us and our Affiliates will contribute to the Marketing and Legislative Fund on the same basis as you are required to do.

(Emphasis added.)

35.    Apart from contributions to the Marketing and Legislative Fund, which were capped at 3%, the Franchisees had no further obligation to pay DirectBuy for the creation, development, and placement of advertising or marketing programs.

36.    The FDDs likewise disclosed no additional obligation of Plaintiffs and Franchisees to pay for the creation, development, and placement of advertising or marketing programs.[2]

37.    Prior to entering into the Franchise Agreements, the Franchisees, including Plaintiffs, received an FDD that disclosed the following (or something substantially similar).

---

[2] The FTC Franchise Rule requires franchisor to disclose, in an FDD provided to the prospective franchisee before purchasing the franchise, all of the fees a franchisee will be required to pay upon and after entering into the franchise agreement.

ITEM 6
OTHER FEES
FRANCHISE AGREEMENT

| TYPE OF FEE (Note 1) | AMOUNT | DUE DATE | REMARKS (Note 1) |
|---|---|---|---|
| *** | *** | *** | *** |
| Marketing and Legislative Fund Contributions | Not due during your first year; $1,000 per year thereafter.  We may increase the contribution to 3% of your new membership sales. | 30 days after the beginning of each year. | Currently, we are not collected (*sic*) these contributions, but may do so in the future. |

NOTE 1:  All fees are payable to us or one of our affiliates.  None of the fees are refundable.

38.     Item 11 of the FDD, which is titled Franchisor's Obligations, also stated as follows:

We may, in our sole discretion, establish and administer a fund ("the Marketing and Legislative Fund" or "the Fund") for the creation and development of marketing, advertising, and related programs and/or legislative, legal and regulatory defense programs relating to buyer clubs and other laws and regulations that affect [DirectBuy] centers.  The Fund currently is used only for legislative, legal and regulatory defense programs and you may be required to contribute $1000 annually to the Fund.  We voluntarily match your contributions to the Fund.   We reserve the right to broaden the scope of the Fund to include marketing, advertising and related programs **and to increase the amounts of your contributions to not more than 3% of your new membership fees**.

(Emphasis added.)

39.     Apart from the disclosures in Items 6 and 11, DirectBuy made no other disclosures in its FDD to alert Franchisees that they would be obligated to pay DirectBuy mandatory advertising or marketing fees.   Specifically, DirectBuy did not disclose to prospective franchisees that they could be charged separate additional advertising or marketing fees above the 3% Cap.

40.     Plaintiffs and Franchisees understood that the fees they were required to pay to

DirectBuy for advertising and marketing were capped at 3%.

41.    Paragraph 3.03 of the Franchise Agreements and Items 6 and 11 of the FDD are the only places where DirectBuy has the right to charge Plaintiffs and Franchisees anything for advertising.

### The Beginning of a "DirectBuy-Controlled Marketing Campaign"

42.    Prior to 2003, franchisees were solely responsible for advertising, as they saw fit, at the local and/or regional level.   During this time, DirectBuy did not provide any advertising services locally, regionally, or nationally.  Accordingly, franchisees did not pay DirectBuy any monies for marketing and advertising programs.  Instead, franchisees were in control of the amount they chose to spend on marketing and advertising for their individual stores.

43.    In 2003, DirectBuy, then operating under the brand UCC Total Home, adopted the DirectBuy brand name, established an in-house marketing department, and began providing its franchisees with an infomercial promoting the DirectBuy brand for the franchisees to use in their local markets.

44.    Shortly thereafter, DirectBuy began placing advertising in franchisees' local media markets.  Franchisees were charged for the advertising placed by DirectBuy on a "per lead generated" basis.   This resulted in the franchisees being charged for nearly all of the expenses of the marketing and advertising programs.  Franchisees had no control over the amount or type of advertising DirectBuy placed or the charges DirectBuy assessed for such advertising but these charges, during this initial period of time, did not exceed the 3% Cap.

45.    Plaintiffs and Franchisees were required by DirectBuy to establish and maintain

credit cards, which DirectBuy charged for the marketing and advertising expenses DirectBuy apportioned to the individual Franchisees.   These charges were made on a weekly basis and Plaintiffs and Franchisees were sent media bills detailing the charges.

46.    In or about October 2005, DirectBuy, for the first time, was able to franchise its concept in California due to changes in California's laws that had previously prohibited the operation of buying clubs such as DirectBuy.

47.    In late 2005, DirectBuy implemented a comprehensive marketing and advertising program, on a trial basis.   In January 2006, DirectBuy's comprehensive marketing and advertising program became mandatory for all franchisees ("the DB Marketing & Advertising Program").   The DB Marketing & Advertising Program encompassed creation and placement of marketing and advertising both nationally and in Plaintiffs and Franchisees' local markets.   Under the DB Marketing & Advertising Program, DirectBuy had sole discretion to decide the content of ads, in what type of media and what markets they would be placed, and how much would be spent on creating and placing marketing and advertising for Plaintiffs and Franchisees.

*48.*    When the DB Marketing & Advertising Program was initially instituted, the charges DirectBuy assessed Plaintiffs and Franchisees for marketing and advertising increased but were still not in excess of the 3% Cap.

***Trivest Acquires DirectBuy and Advertising Fees Soar Out of Control***

49.    In or about November 2007, Trivest acquired a primary ownership interest in DB Holdings.  At that same time, United Consumer Club, Inc. ("UCC"), of which DirectBuy is a wholly-owned subsidiary, was acquired by and became a wholly-owned subsidiary of

14

DB Holdings.   Trivest maintained its primary ownership interest in DB Holdings at all times relevant to this dispute.

50.    Upon information and belief, Trivest paid $550 million to purchase DirectBuy, through its acquisition of DB Holdings, in a highly leveraged deal.   Indeed, upon information and belief, Trivest caused DB Holdings to issue $375 million in high yield bonds to finance the majority of the purchase price.   Trivest also caused DirectBuy to guarantee this debt of DB Holdings for the entire amount and term of the bonds, with all of the assets of DirectBuy acting as security.   Further, Trivest caused DirectBuy to make the required payments on the bonds through an unsecured, undocumented, non-interest bearing "loan" from DirectBuy to DB Holdings, with the "loan" principal increasing over time as interest payments were made on the bonds.

51.    Trivest structured its purchase of DirectBuy in such a manner so that the vast majority of the financial risk would be placed on the DirectBuy system itself, rather than on Trivest.   Its actions were targeted at the Plaintiffs and the Franchisees who bore the brunt of Trivest's efforts to shift the risk of its investment.

52.    Upon information and belief, Trivest planned and executed this transaction predominantly or entirely from its offices in Florida.

53.    After Trivest purchased DB Holdings, Trivest installed Templeton as the Chairman of the Board of Directors for DirectBuy and DB Holdings, Inc.   However, rather than limiting his actions to those typical for a Board Chairman and allowing DirectBuy's then-president Scott Powell to handle the operations of DirectBuy, Templeton was actively involved in the strategic and tactical decision-making, to the point that Mr. Powell needed

Trivest and Templeton's approval before taking action on any significant operational issue.

54.    After Trivest purchased DirectBuy and began, through Templeton, controlling DirectBuy's activities, Plaintiffs and Franchisees' costs for marketing and advertising increased exponentially.   DirectBuy charged Plaintiffs and Franchisees many times the amounts the Plaintiffs and Franchisees had been spending when they placed their own advertising, and far more than 3% of Plaintiffs and Franchisees' new membership sales fees, as allowed under the Franchise Agreements.   Upon information and belief, Trivest and Templeton conceived and perpetrated this plan predominantly or entirely in Florida.

55.    For example, in 2009, when DirectBuy had approximately 135 franchisees system-wide, franchisees were collectively billed approximately $71,000,000 for marketing and advertising.   Had the 3% Cap been honored, franchisees would have been billed no more than $10,873,000.   The amount franchisees were billed for marketing and advertising in 2010 was even greater than in 2009.

56.    Indeed, the charges levied on Plaintiffs and Franchisees escalated to the point where franchisees persistently and repeatedly complained that their businesses would be financially ruined if they were required to continue to pay the excessive charges that DirectBuy was imposing.

57.    A number of franchisees asked to withdraw from participation in DirectBuy's national marketing and advertising program.

58.    DirectBuy, however, rather than recognizing the plight of the franchisees, responded that participation was mandatory and refused to allow Plaintiffs and Franchisees to withdraw.   Upon information and belief, DirectBuy gave these directions at the

instruction of Trivest and Templeton. Trivest and Templeton conceived of and issued these instructions predominantly or entirely in Florida.

59.    At multiple DirectBuy annual conferences, and on other occasions, DirectBuy's then-President Scott Powell, and General Counsel, C. Joseph Yast, fraudulently informed franchisees that DirectBuy had the right to impose the charges it was assessing for national marketing and advertising, which exceeded the 3% Cap.

60.    For example, DirectBuy made such statements to franchisees on January 19, 2009, at a joint meeting of DirectBuy's Sales & Marketing and Service & Merchandising Task Forces. This meeting was attended by 18 franchisee-representatives elected by the franchisees in each of their regions; Trivest Managing Partner and DirectBuy Chairman, Troy Templeton, and Trivest Partner, Forest Wester; and 12 Senior Management Executives of DirectBuy, including, but not limited to Scott Powell, DirectBuy President and CEO, and Joe Yast, DirectBuy Vice President and General Counsel.

61.    At the January 19, 2009 meeting, Mr. Yast gave a presentation, with handouts, in which he went through the most recent version of DirectBuy's Franchise Agreement, provision by provision, claiming that each fee DirectBuy was charging, or proposing to charge franchisees, including the excessive fees that DirectBuy was imposing for the creation, development, and placement of national marketing and advertising, was justified by the express terms of DirectBuy's Franchise Agreement. The franchisee representatives present at the meeting understood Mr. Yast to be accurately stating the rights granted to DirectBuy under their own Franchise Agreements, and he did not inform them otherwise. However, Mr. Yast's presentation materially misrepresented DirectBuy's rights to charge

for national marketing and advertising for the following two reasons:

- Mr. Yast did not inform franchisees that he was referencing specific provisions in the October 2008 version of the DirectBuy Franchise Agreement that were not present in earlier versions of the Franchise Agreement. Most DirectBuy franchisees in business at that time operated under earlier versions of the DirectBuy Franchise Agreement that did not contain the provisions Mr. Yast claimed permitted DirectBuy to impose the excessive national marketing and advertising charges it was billing its franchisees.

- The specific provisions of DirectBuy's 2008 Franchise Agreement that Mr. Yast relied upon did not give DirectBuy the right to impose the disputed charges. Instead, the provisions Mr. Yast referred to merely authorized DirectBuy to charge for the franchisee's use of DirectBuy sales and marketing tools and materials, such as infomercials, Internet marketing tools, sales videotapes and sale materials.   Indeed, every version of the Franchise Agreement limits, to 3% of the franchisee's gross new membership revenue, DirectBuy's right to charge franchisees for DirectBuy's discretionary development and placement of national media advertising.

62.    The decision by DirectBuy, at the direction of Templeton, to ignore the contractually mandated 3% Cap was driven by Trivest's need to drive membership sales at the Clubs, so that DirectBuy could generate the revenue necessary to "loan" to DB Holdings to service the bonds that Trivest had caused DB Holdings to issue, so that Trivest could buy DirectBuy.   Trivest needed substantial funds to continuously flow from new Club members' purchases of memberships to Franchisees, from Franchisees' payment of 22% royalties to DirectBuy, from DirectBuy to DB Holdings, and from DB Holding to the

bondholders, to make the payments due to bondholders, so that the veritable house of cards built by Trivest would not collapse.

63.     DirectBuy's primary source of revenue was from the royalties paid by Franchisees upon the sale of membership by the Franchisees.  DirectBuy received a royalty of 22% of the *gross* amount charged to consumers by Franchisees for new memberships, regardless of whether the Franchisee made any *net* profit.   Accordingly, Defendants, acting predominantly or entirely in Florida, utilized the control they had acquired over DirectBuy to require DirectBuy to engage in a course of increasing marketing and advertising spending to drive the sale of more and more new memberships without concern as to whether the increased marketing and advertising charges made the membership sales unprofitable for Plaintiffs and Franchisees.

64.     To make matters worse, Defendants' scheme was initiated and carried out on the cusp of the Great Recession and the burst of the housing bubble.  The prevailing economic conditions reduced potential customers for new memberships at the Clubs, resulting in Defendants instructing DirectBuy to increase the amount spent on marketing and advertising in an attempt to increase new membership sales to, ultimately, service the debt Trivest caused DB Holdings to incur to fund Trivest's purchase of DirectBuy.

65.     In January 2011, Trivest caused DB Holdings to sell $335 million in high interest bonds to replace the bonds that had originally been sold to finance Trivest's purchase of DirectBuy.  Similar to the original bonds, these bonds were guaranteed by DirectBuy and secured by DirectBuy assets.  Also, Trivest continued its practice of requiring DirectBuy to fund the $10 million quarterly interest payment through the ongoing unsecured,

undocumented, non-interest bearing "loan" from DirectBuy to DB Holdings.   Rather than restructuring the debt so that the 3% Cap could be honored and DirectBuy could be in a sound financial position, Trivest merely transferred the risk from one set of bondholders to another and continued its scheme to finance its purchase of DirectBuy through transferring the excessive cost of marketing and advertising to Plaintiffs and Franchisees. Upon information and belief, Trivest and Templeton conceived of and perpetrated this aspect of the plan predominantly or entirely in Florida.

66.    These new bonds rapidly dropped in value and were downgraded by Moody's and Standard & Poor's over the subsequent year as membership sales continued to decline and DB Holdings defaulted on the bond covenants and missed interest payments.

67.    Finally, after years of overcharging Plaintiffs and Franchisees for the marketing and advertising programs, which drove many Franchisees out of business, and after some DirectBuy franchisees sought legal counsel to assert their contractual right to pay no more than the 3% Cap, DirectBuy, effective January 1, 2012, discontinued its excessive overspending on marketing and advertising programs, and thereafter resumed honoring the 3% Cap.

68.    Yet, DirectBuy continued to insist it had a contractual right to impose unlimited charges for national media advertising.  As recently as February 21, 2013, Mr. Yast sent a written communication to all DirectBuy Club Owners (franchisees) informing them that, among other things, there was no 3% cap on media charges in DirectBuy's Franchise Agreement.

69.    Throughout the entire time that DirectBuy engaged in marketing and advertising

programs, and charged the Franchisees for such programs, DirectBuy has submitted weekly media bills to Plaintiffs and Franchisees and automatically charged Plaintiffs and Franchisees' credit cards.  DirectBuy did this regardless of the fact that, from when Trivest first acquired DirectBuy and, through Templeton, controlled DirectBuy, up until January 1, 2012, the amount charged exceeded the 3% Cap.

70.    When a franchisee no longer had any credit left, DirectBuy would take the franchisees' receivables, either by placing the franchisee on the "Direct Pay Program" under which franchisees were forced to have their customers remit funds related to merchandise sales directly to DirectBuy rather than to the franchisee, including handling fees owed to Franchisees; by retaining amounts due to franchisees under the Beta Financing Program, a program under which customers of franchisees were able to finance their membership fees; or by retaining handling fees and renewal fees due to franchisees. In any event, Plaintiffs and Franchisees were powerless to prevent DirectBuy from taking the excessive marketing and advertising fees.  Accordingly, DirectBuy could continue to increase expenditures on marketing and advertising to drive increased membership sales and increased royalties to DirectBuy with little financial disincentive or risk.[3]

71.    Upon information and belief, DirectBuy took these actions at the instruction of Trivest and Templeton.  Trivest and Templeton conceived of and issued these instructions predominantly or entirely in Florida.

---

[3] The marketing and advertising charges in excess of a Franchisee's available credit and receivables was recorded in a "General Bills" account due to DirectBuy from the franchisee.  Some "General Bills" amounts went unpaid as DirectBuy's overspending on marketing and advertising drove franchisees out of business.

72.     DirectBuy did this regardless of the fact that, between November 2007, when Trivest, through Templeton, took control of DirectBuy, and January 1, 2012, the amount charged exceeded the 3% Cap, resulting in literally thousands of fraudulent media bills sent to Plaintiffs and Franchisees and thousands of fraudulent charges on Plaintiffs and Franchisees' credit cards.

## CLASS ACTION ALLEGATIONS

73.     Plaintiffs Elite Advantage, LLC and Edward E. Sell propose a Class consisting of all Franchisees in the United States who were in business at any time between Trivest's purchase of DirectBuy in November 2007 and January 1, 2012, and who paid marketing and advertising fees exceeding the 3% Cap.

74.     This case may be appropriately maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure because all of the prerequisites set forth under Rule 23(a) and 23(b) are met.

*Rule 23(a) Factors*

75.     **Numerosity:** Members of the Class are so numerous that joinder of all such members is impracticable, if not impossible.   Although the exact size of the Class is unknown to Plaintiffss at this juncture, it is believed and alleged that there are more than 160 Franchisees who were in business at any time between November 2007 and January 1, 2012 and paid marketing and advertising fees that exceeded the 3% Cap.

76.     **Existence of Common Questions of Fact and Law:**  There are issues of law and fact common to the Class with respect to the liability issues, relief issues, and anticipated affirmative defenses, which are likely to have common answers.  These common issues of

law and fact predominate over questions affecting only individuals.  Fed. R. Civ. P. 23(b)

(3).  Specifically common issues include, but are not limited to:

    a.  Whether and to what extent Defendants' practice and conduct violated federal law.

    b.  Whether Defendants have engaged in mail and/or wire fraud by fraudulently misrepresenting, to the Franchisees and/or Franchisees' credit card companies, the amount of marketing and advertising fees rightfully owed by the Franchisees.

    c.  Whether Defendants committed financial institution fraud by fraudulently misrepresenting to Franchisees' credit card companies that Franchisees had approved the charging of the marketing and advertising fees in excess of the 3% Cap.

    d.  Whether the DirectBuy franchise system is an enterprise within the meaning of 18 U.S.C. § 1961(4).

    e.  Whether Defendants conducted or participated in the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

    f.  Whether Defendants' overt and/or predicate acts in violation of 18 U.S.C. § 1962(c) proximately caused injury to the Plaintiffs' and Class members' business or property.

    g.  Whether Defendants, in violation of 18 U.S.C. § 1962(d), engaged in a conspiracy to violate 18 U.S.C. § 1962(c).

    h.  Whether Defendants' conspiracy in violation of 18 U.S.C. § 1962(d)

proximately caused injury to the Plaintiffs' and Class members' business or property.

i. Whether the common scheme alleged in this Complaint constitutes unfair, deceptive, and unconscionable acts or practices in violation of the Florida Deceptive and Unfair Trade Practices.

j. Whether Plaintiffs and Class members are entitled to recover compensatory, exemplary, trebled, statutory, or punitive damages based on Defendants' illegal conduct.

k. Whether Plaintiffs and Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

77. **Typicality:** Plaintiffs Elite Advantage, LLC and Edward E. Sell are members of the Class. Defendants acted in the same way toward the Plaintiffs and Class members when engaging in the illegal and fraudulent practices. If brought and prosecuted individually, the claims of each Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

78. **Adequacy:** Plaintiffs Elite Advantage, LLC and Edward E. Sell will fairly and adequately protect the interests of the Class because Plaintiffs Elite Advantage, LLC and Edward E. Sell and their counsel possess the requisite resources and experience to prosecute this case as a class action. Plaintiffs' interests do not conflict with the interests of the members of the Class they seek to represent.

*Rule 23(b) Factors*

79.   The prosecution of separate actions by Class members would create a risk of inconsistent or varying adjudications with respect to individuals that would establish incompatible standards of conduct for parties opposing the Class.  Fed. R. Civ. P. 23(b)(1) (A).  The prosecution of separate actions would create a risk of adjudication with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members that were not parties to the adjudication, and substantially impair, or impede their ability to protect their interests.  Fed. R. Civ. P. 23(b)(1)(B).  A central issue in this case is whether the Defendants violated the RICO statute by conducting or participating in the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and/or engaged in a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).  The Defendants' actions in relation to the violation of the RICO statute were identical to all Class members.   It would be unfair and wasteful to obtain multiple, and potentially conflicting or inconsistent, judicial resolutions of the primary questions in this litigation.  The same can be said for Plaintiffs claims under FDUPTA.

80.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).  In addition, questions of law or fact common to the class members predominate over any questions affecting individual members.   Fed. R. Civ. P. 23(b)(3).  The only even arguably individual question in this case is damages.  However, the damages are comprised of the marketing and advertising charges unlawfully extracted and retained from Plaintiffs and Class members in excess of

the 3% Cap, which can be easily derived through a mechanical application of simple arithmetic for all members of the Class based on the gross revenues generated from new membership sales and the amount paid to DirectBuy in excess of the 3% Cap.

81.    Members of the Class have little or no interest in individually controlling the prosecution of separate actions.  Fed. R. Civ. P. 23(b)(3)(A).  Plaintiffs are not aware of any other litigation concerning the claims contained in this complaint.   Fed. R. Civ. P. 23(b)(3)(B).  It is desirable to concentrate the litigation of the claims in this Court because Defendants are located here.    Fed. R. Civ. P. 23(b)(3)(C).    Finally, this action is manageable as a class action because, compared to any other method such as individual interventions or the consolidation of individual actions, a class action is more fair and efficient. Fed. R. Civ. P. 23(b)(3)(D).

82.    The stakes and difficulty of individual Franchisees bringing individual claims in Florida, far from most of their home states and cities, means that the only realistic alternative to a class action is likely to be no suits at all, and, therefore, Defendants will never be called to account for their misconduct.

83.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  The names and addresses of the potential members of the Class are available from publicly available documents (*i.e.*, the FDDs from the relevant time period).   Plaintiffs contemplate providing a notice or notices to the Class, as approved by the Court, to be delivered through the United States mail or as otherwise directed.  The notice or notices shall, among other things, advise the Class that they shall be entitled to "opt out" of the Class if they so request by a date

specified within the notice, and that any judgment, whether favorable or not, entered in this case will bind all class members except those who affirmatively exclude themselves by timely opting out.

**CLAIM I**
**VIOLATIONS OF RICO ACT**
**18 U.S.C. § 1962(c)**

84.   Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

85.   Defendants have violated 18 U.S.C. § 1962(c) because they have conducted or participated, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

86.   The Defendants, together with DB Holdings, UCC, DirectBuy, their affiliates and subsidiaries involved in the activities of the DirectBuy franchise system, and Franchisees, comprise an "association-in-fact" enterprise (the "DirectBuy Enterprise") within the meaning of 18 U.S.C. § 1961(4).   The DirectBuy Enterprise is separate and distinct from the individual Defendants that participate in it and direct its affairs.

87.   The structure of the DirectBuy Enterprise is imposed by and consists of, among other things: (1) the terms of the Franchise Agreements Franchisees sign in order to be entitled to operate a Club; (2) the terms of the agreements between Franchisees and Beta Finance Company, Inc., a subsidiary of UCC, regarding the financing of customers' purchases of club memberships; (3) the terms and conditions of the DirectBuy operations manual that purports to allow DirectBuy as franchisor to dictate certain aspects of Club operations; (4) the ownership structure of the DirectBuy franchise system that, at all

27

relevant times, consisted of the Trivest business entities, DB Holdings, UCC, and DirectBuy, whereby each business entity was involved in and directed the strategic decision-making of its subordinate entities in the ownership structure; and (5) Defendants' active involvement in the operations of DirectBuy.

88.    The contractual and ownership rights of Defendants allow Defendants to control the Franchisees' actions in the manner of a classic top down hierarchy, in which decisions are made by Defendants, dictated to DB Holdings, UCC, and DirectBuy, and then imposed on Franchisees, who have no choice but to follow the orders or risk termination and thereby lose their investment in the Club.

89.    Each Franchisee is a person or legal entity separate from any and all of the Defendants, DB Holdings, UCC, and DirectBuy.  Further, each Defendant is a person or legal entity separate from any and all other Defendants, DB Holdings, UCC, and DirectBuy.  Because Franchisees were, during the relevant period, subject to the control of Defendants, through Defendants' exercise of control over DB Holdings, UCC, and DirectBuy, in the service of a common purpose, all are part of the same association-in-fact enterprise.

90.    There are numerous aspects of the DirectBuy Enterprise that did not involve conduct that was intrinsically criminal or illegal, including, but not limited to: (1) the sale of Club memberships and the provision of service to Club members; (2) the actual advertising of Club memberships and services to members of the public; (3) the hiring of employees by Defendants, DB Holdings, UCC, DirectBuy, Inc., and Franchisees to perform ordinary business functions that have no relation to the fraudulent scheme alleged;

(4) the ownership of DB Holdings by Trivest; and (5) many other day-to-day business activities.

91.    All of the members of the DirectBuy Enterprise share the common purpose of selling and servicing Club memberships to generate positive cash flow.    Franchisees shared this goal with Defendants despite the fact that Defendants defrauded Franchisees into paying excessive marketing and advertising fees.    It would have been possible for Defendants to work within the law and not fraudulently induce Franchisees, through Defendants' control of DirectBuy, into paying excessive marketing and advertising fees. Defendants' and DirectBuy's fraudulent scheme to induce Franchisees into paying marketing and advertising fees in excess of the 3% Cap transformed the DirectBuy Enterprise from a legitimate business enterprise into an ongoing criminal organization.

92.    Defendants conducted the affairs of the DirectBuy Enterprise, as opposed to merely their own affairs, by, among other things, directing DirectBuy to engage in advertising and marketing programs to drive new membership sales, thereby increasing royalties, without regard to the cost of such programs, and pass the cost of such programs along to Plaintiffs and Franchisees through media bills and charges that fraudulently overstated the amounts lawfully due from Plaintiffs and Franchisees, and fraudulently made charges to Plaintiffs and Franchisees' credit cards in amounts in excess of those authorized.

93.    If it were not for the separate legal existence of Plaintiffs and Franchisees, Defendants would not have been able to effectuate their scheme of directing and conducting the affairs of the DirectBuy Enterprise so as to defraud Plaintiffs and Franchisees of money and/or property.    For example, only by virtue of the separate legal

existence of Plaintiffs and Franchisees could Defendants fraudulently induce Plaintiffs and Franchisees to pay marketing and advertising fees in excess of the 3% Cap and effectuate Defendants' goal of having Plaintiffs and Franchisees, through royalty payments to DirectBuy, pay for Defendants' acquisition of the DirectBuy franchise system.   This outsourcing of costs would be impossible if DirectBuy operated exclusively through company-owned Clubs.

94.   Defendants participated in the conduct of the DirectBuy Enterprise by directing DirectBuy to fraudulently induce Franchisees into paying marketing and advertising fees in excess of the 3% Cap, through both the fraudulent media bills sent to Plaintiffs and Franchisees and the fraudulent charges on Plaintiffs and Franchisees' credit cards.

95.   The predicate crimes committed by Defendants are mail fraud, as defined by 18 U.S.C. § 1341, wire fraud, as defined by 18 U.S.C. § 1343, and financial institution fraud, as defined by 18 U.S.C. § 1344.

96.   In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, Defendants devised and effected a scheme to defraud Plaintiffs and Franchisees by knowingly and deliberately directing DirectBuy to induce Plaintiffs and Franchisees to pay marketing and advertising fees in excess of the 3% Cap through the provision of fraudulent media bills.

97.   The execution of the scheme to defraud Franchisees involved a voluminous number of individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by Defendants and were essential parts of the fraudulent scheme.   Specific instances of the uses of the United States mails and

interstate wire communications in furtherance of the fraudulent scheme include sending media bills to Plaintiffs and Franchisees through the United States mail and over the internet via email, transferring receivables rightfully owned by Plaintiffs and Franchisees to DirectBuy via interstate wire transfers, transmitting fraudulent charges to the Plaintiffs and Franchisees' credit card companies via interstate wire, and receipt of sales leads by Plaintiffs and Franchisees through interstate wire communications and/or the United States mail.

98.    Over the years that the fraudulent scheme was perpetuated, thousands of fraudulent communications were transmitted through the United States mail and via interstate wire.  It is Defendants, not Plaintiffs, who have, or have access to, the records of these thousands of communications that contained fraudulent representations or were essential parts of the scheme to defraud Franchisees.

99.    In violation of 18 U.S.C. § 1344, Defendants knowingly attempted to execute, and did execute, a scheme to defraud Plaintiffs and Franchisees' credit card companies, each a financial institution insured by the Federal Deposit Insurance Corporation, by knowingly and deliberately directing and causing DirectBuy to submit fraudulent charges to such credit card companies that were not authorized by Plaintiffs and Franchisees and were based on marketing and advertising fees that were in excess of the 3% Cap.

100.   The predicate acts committed by Defendants constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

101.   The acts of mail and wire fraud alleged herein are related because they involve repeated instances of the use of the United States mails and interstate wire facilities to

defraud Plaintiffs and Franchisees through the provision of fraudulent media bills for marketing and advertising fees in excess of the 3% Cap, and the fraudulent overcharging of Plaintiffs and Franchisees' credit cards, resulting in Franchisees unwittingly funding Defendants' purchase of DB Holdings.  Additionally, all Franchisees in operation during the relevant period were victimized by the fraudulent scheme.  Further, the repeated acts of mail and wire fraud occurred over a time span in excess of four years.

102.   Similar to the acts of mail and wire fraud, the acts of financial institution fraud are related because they involved the repeated defrauding of Plaintiffs and Franchisees' credit card companies, were in relation to credit accounts of all Franchisees in operation during the relevant period, and occurred over a span of more than four years.

103.   Plaintiffs and Franchisees have been damaged by reason of Defendants' having conducted the affairs of the DirectBuy Enterprise through the pattern of racketeering alleged herein.  In particular there is a direct and proximate chain of causation from the fraudulent media bills sent to Franchisees and the fraudulent charges submitted to Plaintiffs and Franchisees' credit card companies to the economic losses suffered by Plaintiffs and the Franchisees.  The economic losses suffered by Plaintiffs and Franchisees are the natural and expected consequence of fraudulent schemes perpetrated by Defendants.  Also, there are no other parties who have more directly suffered the economic losses that have been incurred by the Plaintiffs and Franchisees.  The damages arising from the mail and wire fraud were directly aimed at Plaintiffs and Franchisees.  The damages arising from the financial institution fraud directly damaged Plaintiffs and Franchisees because Plaintiffs and Franchisees were required to, and did, pay their credit card

companies for the fraudulent charges.   Further, Plaintiffs and Franchisees are best equipped to prosecute the financial institution fraud claims because Plaintiffs and Franchisees' credit card companies are likely unaware that the fraudulent scheme has occurred, as Plaintiffs and Franchisees' credit card companies were not privy to the Franchise Agreements that contain the 3% Cap.

Plaintiffs and Franchisees have been damaged by Defendants operating and conducting the affairs of the DirectBuy Enterprise through a pattern of racketeering, with predicate acts consisting of mail fraud, wire fraud, and financial institution fraud, in an amount to be proven at trial, which shall also be trebled via 18 U.S.C. § 1964(c).   Additionally, Plaintiffs and Franchisees are entitled to their attorneys' fees and costs.

## CLAIM II
## VIOLATION OF RICO
## 18 U.S.C. § 1962(d)

104.   Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

105.   Under 18 U.S.C. § 1962(d) it is unlawful:

for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

106.   Defendants have intentionally conspired and agreed with DirectBuy to directly and indirectly conduct and participate in the affairs of the DirectBuy Enterprise in a pattern of racketeering activity, as described above, through Defendants' direction and control of DirectBuy after Defendants purchased DB Holdings and Templeton was installed as the

Chairman of DirectBuy Board of Directors, thereafter requiring DirectBuy's executive leadership to receive approval for all significant operational decisions.

107.  Defendants participated in the conspiracy by being actively involved in the significant decisions of DirectBuy, including the decision to increase the marketing and advertising fees charged to Franchisees above the 3% Cap.

108.  Plaintiffs and Franchisees have been injured in their business and property as a result of the violations of 18 U.S.C. § 1962(d).   As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered damages in an amount to be demonstrated at trial which shall also be trebled via 18 U.S.C. § 1964(c). Additionally, Plaintiffs and Franchisees are entitled to their attorneys' fees and costs.

## CLAIM III
## VIOLATION OF FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT
### Fla. Stat. §501.201, *et seq.*

109.  Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

110.  By the acts described above, Defendants have engaged in unfair, deceptive, and unconscionable acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fl. Stat. § 501.201, *et seq.*

111.  Defendants' unconscionable and deceptive acts and practices were designed to inflict injury and harm upon Plaintiffs and Franchisees and to gain an unfair business advantage at Plaintiffs and Franchisees' expense.

112.   Defendants acquired DirectBuy and its affiliated companies in a highly leveraged transaction with the intent that the revenues generated by DirectBuy would cover the debt service on the bonds issued to cover Trivest's purchase of DirectBuy.  When the revenues generated by DirectBuy proved insufficient to cover the debt service on the bonds, Trivest masterminded a scheme to drastically increase the amount that DirectBuy spent on national advertising to increase franchisees' membership sales and, thus, the royalties that flowed from the franchisees to DirectBuy, and from DirectBuy to Trivest.  The cornerstone of this scheme was that virtually the entire amount DirectBuy spent on national marketing and advertising, which averaged between $1 million and $1.5 million per week, would be charged back to the franchisees, grossly exceeding the amount that DirectBuy was permitted to charge franchisees for national marketing and advertising under its Franchise Agreements.  Franchisees who objected to these excessive and unauthorized charges were threatened with termination of their franchise agreements and the loss of their substantial investments in their DirectBuy Clubs.

113.   As a result of these excessive charges, many franchisees, including Plaintiffs, who once operated successful and lucrative businesses, could not sustain the ongoing operating losses and were forced to close their doors.  Those franchisees that remain in business are struggling to survive.

114.   Defendants have injured Plaintiffs and Franchisees through their deceptive, unfair, and unconscionable trade practices in violation of Fla. Stat. § 501.205 in an amount that is currently unknown, but in excess of $5,000,000, exclusive of interest and costs.

**115.**   Additionally, Plaintiffs and Franchisees are entitled to recover their attorneys' fees and court costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Defendants as follows:

1.   For a determination that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

2.   For a finding that Defendants violated the RICO Act and for an appropriate damage award thereunder;

3.   For a finding that Defendants violated the Florida Deceptive and Unfair Trade Practices Act and for an appropriate damages award thereunder;

4.   For compensatory damages in an amount not less than the jurisdictional minimum of this Court in an amount to be proven at trial;

5.   For exemplary damages against each Defendant;

6.   For pre-judgment interest, as allowed by applicable law;

7.   For attorneys' fees and costs, as allowed by Fla. Stat. §§ 501.2105 and 501.211 or other applicable law; and

8.   For such other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all other current and former DirectBuy franchisees similarly situated, demand a trial by jury for all matters that may be tried before a jury.

Dated: June 5, 2015

Respectfully submitted,

**THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.**
*Attorneys for Plaintiffs*
2 South Biscayne Blvd.
Suite 3570
Miami, Florida  33131
Telephone:  (305) 361-5500
Facsimile:  (305) 428-9532


By:    /s/ Stephen James Binhak
          Stephen James Binhak, Esq.
          Florida Bar No. 0736491
          binhaks@binhaklaw.com

**OF COUNSEL:**

J. Michael Dady
Barbara A. Bagdon
Kristy Zastrow
Keith A. Marnholtz
DADY & GARDNER, P.A.
5100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 359-9000
jmdady@dadygardner.com
bbagdon@dadygardner.com
kzastrow@dadygardner.com
kmarnholtz@dadygardner.com

Joseph S. Goode, Esq.
Mark M. Leitner, Esq.
Jessica L. Farley, Esq.
PIA, ANDERSON, DORIUS,
REYNARD & MOSS
400 N. Broadway
Suite 303
Milwaukee, Wisconsin  53202
Telephone: (414) 792-9667
jgoode@padrm.com
mleitner@padrm.com
jfarley@padrm.com

***Attorneys for Plaintiffs***